KAMAL P. SINGH et al., Plaintiffs-Appellants, v. THE DEPARTMENT OF PROFESSIONAL REGULATION et al., Defendants-Appellees.

First Division (1st Division)   No. 1—91—1019

Opinion filed August 9, 1993.

Law Offices of Samuel V.P. Banks, of Chicago (Terrence P. Lefevour, of counsel), for appellants.

Roland W. Burris, Attorney General, of Chicago (Rosalyn B. Kaplan, Solicitor General, and Alison E. O'Hara, Assistant Attorney General, of Chicago, of counsel), for appellees.

JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiffs Kamal Singh and Stone Park Drugs appeal an order of the circuit court of Cook County affirming an order of defendant Illinois Department of Professional Regulation (DPR) suspending Singh's pharmacist license for a minimum of five years and suspending the pharmacy and controlled substances licenses of Stone Park Drugs for a minimum of two years.

The record on appeal indicates the following facts. On November 21, 1989, the DPR filed an administrative complaint against Kamal Singh and Stone Park Drugs. The complaint alleged that plaintiffs violated the Pharmacy Practice Act (Ill. Rev. Stat. 1985, ch. 111, par. 4001 *et seq.*), revised and recodified as the Pharmacy Practice Act of 1987 (Ill. Rev. Stat. 1987, ch. 111, par. 4121 *et seq.*) and the Illinois Controlled Substances Act (Ill. Rev. Stat. 1985, ch. 56½, par. 1100 *et seq.*) by: (1) having overages and shortages of controlled substances;

(2) failing to properly document sales of schedule V controlled substances; (3) failing to send properly completed schedule V sale reports to the DPR; (4) allowing the dispensing of a prescription by a technician without a pharmacist on duty; and (5) failing to dispense Ritalin in good faith to six customers. Singh and Stone Park Drugs filed an answer generally denying the allegations.

On June 6, 1990, a hearing was held before Thomas Chiola, who acted both as the hearing officer for the State Board of Pharmacy of the DPR and as the controlled substances hearing officer.

During this hearing, Kamal Singh testified that he graduated from Texas Southern University in 1976 with a bachelor of science in pharmacy. He became registered as a pharmacist in Illinois in November 1976. After working in two hospitals and several retail stores, Singh became the sole shareholder of Stone Park Drugs in October 1981. Singh was also the pharmacist in charge of the pharmacy located in a corner of the retail store.

Michael Healy, a controlled substance inspector of the DPR, testified that on May 30, 1987, he went to Stone Park Drugs to review the pharmacy's schedule II controlled substance prescription file. Healy indicated that as he entered the store at approximately 5:30 p.m., he observed a customer present a prescription to a man Healy identified as Kritipaul Anand, who was a licensed pharmacist's technician employed by the store. According to Healy, the technician took a stock bottle of pills from behind the counter and poured out a quantity of pills. Mr. Anand asked the customer whether he wanted 50 pills, as indicated on the prescription, or a one-month supply. The customer, who Healy later identified as Mr. Lopez, indicated he preferred a one-month supply. Lopez asked Anand whether he should take a pill before or after breakfast. Anand responded that it did not matter, but that they should not be taken at night.

Healy further testified that he saw Anand affix a label to a second bottle. Anand handed the bottle to Lopez, who paid Anand and then left the store. Healy later determined that the prescription filled was for Dyazide, a noncontrolled substance. Healy identified himself to Anand. Upon learning that Anand was a technician, Healy spoke with Anand regarding the whereabouts of the pharmacist in charge. Anand told Healy that the pharmacist in charge had gone across the street for a bite to eat. Healy then conducted his review of the schedule II file. At approximately 6:07 p.m., Singh entered the store, identified himself to Healy and asked what had happened. Healy indicated that Anand was being placed under arrest for practicing pharmacy without a license. However, Healy did not file a complaint against Anand at

that time. Singh testified that he prepared the prescription at issue before he left and Anand merely sold the pills to Lopez.

Charles Sauer, another DPR investigator, testified that he conducted an inspection of Stone Park Drugs on March 31, 1988. Sauer inspected the pharmacy's schedule V controlled substance sales record book. The record book contained white original records of sales and yellow carbon copies for each original record. Sauer testified that the yellow carbon copies are supposed to be sent to the DPR by the 15th of the month following a sale. Sauer indicated that none of the copies had been sent in and that Singh admitted this to him during the inspection.

Singh testified that he told Sauer that he was unaware of the mailing requirement. Singh indicated that with one exception, he has complied with this requirement since the inspection.

Sauer testified that he also reviewed other records in the pharmacy, including the schedule II controlled substances prescription file. Sauer testified regarding Ritalin prescriptions filled for six persons. Copies of some of these prescriptions were introduced into the record; the hearing officer limited the number introduced in order to conform with the DPR's complaint. The record indicates that between February 1986 and March 1988, the following Ritalin prescriptions were filled: (1) David Brown—46 prescriptions written by 19 different doctors; (2) Edward Lake—eight prescriptions written by six different doctors; (3) James Reed—four prescriptions written by two different doctors; (4) Felton Brown—two prescriptions written by different doctors; (5) Marvin Duncan—two prescriptions written by different doctors; (6) Cyrita Sampson—two prescriptions written by different doctors.

John Kueter, after *voir dire*, was deemed qualified as an expert in community pharmacy in the Chicago area. Kueter characterized Ritalin as a central nervous system stimulant used to treat hyperkinetic children and narcolepsy in adults. Ritalin is classified as a schedule II controlled substance because its addictive nature creates a potential for abuse.

Kueter reviewed the Ritalin prescriptions obtained by Sauer and determined that Singh had dispensed the drug to the aforementioned six customers without good faith. Kueter testified that: David Brown's prescriptions were written by 16 different doctors over a two-year period; David Brown listed at least 10 different addresses, all of which were more than 10 miles apart from each other; the addresses were often more than 10 miles from the addresses of both the doctor and the pharmacy; and the frequency of refills was excessive.

For example, Kueter testified that in one month, David Brown presented four prescriptions from four different doctors and received 290 Ritalin tablets. Kueter testified that a normal monthly supply would be 90 tablets. Kueter testified that in another instance, David Brown had prescriptions filled two days in a row. In a third instance, David Brown presented two prescriptions filled by different doctors on the same date.

Kueter testified that the prescriptions for Felton Brown were filled without good faith. Kueter noted that Felton Brown listed different addresses, the prescriptions were written by different doctors and that the addresses of Felton Brown and the doctors were more than 10 miles apart and more than 10 miles from the pharmacy. Kueter further noted that the second prescription was filled before the first should have expired.

Kueter also testified that the prescriptions for Marvin Duncan were filled without good faith for reasons substantially similar to those given for the Felton Brown prescriptions.

Kueter then testified that the prescriptions for Edward Lake were filled without good faith. Kueter noted that the eight prescriptions were written by seven doctors, that the addresses of Lake, the doctors and the pharmacy were far apart and later prescriptions were filled before previous prescriptions should have expired.

According to Kueter, overlapping prescriptions were also indicative of a lack of good faith in the prescriptions filled for James Reed, who received 390 tablets in two months instead of the usual 90-tablet monthly allotment. In addition, Kueter noted that Reed listed three different addresses and did not give an address for one of the four prescriptions. Three of the prescriptions were written by different doctors.

Finally, Kueter opined that the prescriptions for Cyrita Sampson were filled without good faith. Again, Kueter noted that Sampson gave different home addresses and had prescriptions from different doctors. The prescriptions overlapped each other. The addresses of Sampson, the doctors and the pharmacy were far apart from each other.

Singh stated that he called many of the prescribing doctors to determine the validity of the Ritalin prescriptions. Sauer indicated that he contacted one of the prescribing physicians, who indicated that he issued the prescription at issue. Singh testified that he filled Ritalin prescriptions because not many pharmacies met this need and that he limited the service to a small number of people who had been given prescriptions by a small number of doctors. Singh stated he had not

filled Ritalin prescriptions since 1988. Singh admitted that the pharmacy did not have a computer system or patient profile cards.

Sauer testified that he returned to Stone Park Drugs on June 20, 1988, to conduct a controlled substances accountability audit. Sauer indicated that such audits are conducted to determine whether controlled substances are missing in relation to the pharmacy's listed stock and documented sales. Sauer also indicated that Singh was present for the audit and that the two agreed on estimates of drugs in each bottle. Sauer stated that in the event of a disagreement, he deferred to Singh's estimate.

Sauer testified that the audit disclosed the following discrepancies in the pharmacy's stock of controlled substances: (1) Bromanyl—55-ounce shortage; (2) Hycodan—52-ounce shortage; (3) Phenergan with codeine—24-ounce shortage; (4) Darvon Compound 65—3,282-tablet shortage; (5) Fastin (30 mg.)—3,295-tablet shortage; (6) Fiorinal—348-tablet overage; (7) Tenuate (75 mg.)—410-tablet shortage; (8) Tylenol Four with codeine—3,874-tablet shortage; (9) Valium (10 mg.)—10-tablet shortage; (10) Vicodin—729-tablet shortage.

Singh testified that at the time it did not occur to him that anything was suddenly wrong regarding the apparent discrepancies. Singh indicated that the loss of inventory was due to a lack of security or awareness. Singh also indicated that he had added security to prevent future losses.

Richard Kuhlman, the supervisor of the DPR drug compliance unit, testified that he investigated Stone Park Drugs and determined that the schedule V sale records for July 1989 had not been sent to the DPR.

On June 26, 1990, the hearing officer issued a report and recommendation in this case. The hearing officer found that Singh failed in his responsibility as pharmacist in charge of Stone Park Drugs to account for all controlled substances entering and leaving the pharmacy. The hearing officer also found that Singh had failed to properly document schedule V sales on numerous occasions and to send the required schedule V sales reports to the DPR from January 1984 through February 1988 and again in July 1989. The hearing officer determined that Singh did not dispense Ritalin in good faith to the six customers at issue, finding that Singh's testimony that he contacted the prescribing physicians was not credible in the face of the evidence presented. The hearing officer further determined that Singh allowed a technician to dispense a prescription without a pharmacist on duty, finding Healy's testimony regarding this charge to be credible.

The hearing officer recommended "strong discipline" regarding the plaintiffs' pharmacy licenses as well as suspending the controlled substances license of Stone Park Drugs for a minimum of two years. In recommending "strong discipline," the hearing officer referred to another case with similar issues where revocation of the pharmacy's license and a five-year minimum suspension of the pharmacist in charge's license were recommended. The hearing officer noted, however, that this case was not as egregious as the prior case.

On July 23, 1990, the State Board of Pharmacy adopted the findings and conclusions of the hearing officer, recommending the suspension of Singh's pharmacist license for a minimum of five years and suspension of the pharmacy and controlled substances licenses of Stone Park Drugs for a minimum of two years.

Plaintiffs filed a petition for rehearing on August 17, 1990, which was denied by the Director of the DPR on October 10, 1990. The Director of the DPR ordered the suspensions recommended by the State Board of Pharmacy. Plaintiffs then filed a complaint for administrative review in the circuit court of Cook County on October 26, 1990. Following a hearing on February 28, 1991, the trial court affirmed the decision of the Director in its entirety. Plaintiffs now appeal.

I

Initially, we note the standard of review of an administrative agency's decisions. The findings and conclusions of an administrative agency are *prima facie* true and correct and will not be reversed unless they are against the manifest weight of the evidence or are not supported by substantial evidence or foundation in the record. (*Ballin Drugs, Inc. v. Department of Registration & Education* (1988), 166 Ill. App. 3d 520, 530, 519 N.E.2d 1151, 1158-59.) A reviewing body lacks the authority to reweigh the evidence or the credibility of the witnesses. See *Ballin Drugs*, 166 Ill. App. 3d at 530, 519 N.E.2d at 1159.

II

Plaintiffs argue that the DPR's findings lacked substantial foundation in the record. We address each finding in turn.

A

■ Plaintiffs first assert that the evidence that Anand sold a noncontrolled substance to Lopez simply does not establish a violation of the Illinois Controlled Substances Act. Plaintiffs are correct. However, the DPR did not allege that Anand's actions violated the Illinois

Controlled Substances Act. Rather, the DPR alleged that Anand's actions violated section 5(a) of the Pharmacy Practice Act, which provides in part that it is

"unlawful for any employer to allow any person in his employ to engage in the practice of pharmacy in this state, unless such person who shall engage in the practice of pharmacy in this state shall be first authorized to do so under the provisions of this Act." (Ill. Rev. Stat. 1985, ch. 111, par. 4006(a).)

Section 3(d) of the Pharmacy Practice Act provides in part:

"The term 'practice of pharmacy' *** means and includes the compounding, dispensing, recommending or advising concerning contents and therapeutic values and uses, offering for sale or selling at retail, drugs, medicines or poisons, whether pursuant to prescriptions or orders of duly licensed physicians, *** or in the absence and entirely independent of such prescriptions or orders, *** any other act *** requiring, involving or employing the science or art of any branch of the pharmaceutical profession, study or training." Ill. Rev. Stat. 1985, ch. 111, par. 4003(d).

In finding a violation of the Pharmacy Practice Act in this case, the hearing officer expressly found Healy's testimony regarding Anand's actions to be credible. It seems reasonable to infer from this finding that the testimony of Singh that he had filled the prescription before leaving for his meal was rejected by the hearing officer, the State Board of Pharmacy and the Director of the DPR. As noted above, this court generally does not reweigh the evidence or the credibility of witnesses. Consequently, plaintiffs have failed to show that a reversal is warranted on this charge.

B

Plaintiffs claim that it is clearly evident that they did not violate the Pharmacy Practice Act or the Illinois Controlled Substances Act regarding the missing drug inventory. The Pharmacy Practice Act provides for discipline "[u]pon a finding of a substantial discrepancy in a Department audit of a prescription drug, including controlled substances." (Ill. Rev. Stat. 1987, ch. 111, par. 4150(19).) The Illinois Controlled Substances Act provides for discipline where a pharmacist "has failed to provide effective controls against the diversion of controlled substances in other than legitimate medical, scientific or industrial channels." Ill. Rev. Stat. 1985, ch. 56½, par. 1304(a)(6).

In this case, the record shows that the DPR's accountability audit revealed numerous discrepancies in the pharmacy's inventory of

controlled substances. In several instances, there were shortages of thousands of tablets. Singh testified that the loss of inventory was due to a lack of security or awareness. Given this record, the findings of the DPR that substantial discrepancies in the controlled substances inventory existed and that plaintiffs failed to exercise effective control over that inventory were not against the manifest weight of the evidence.

Plaintiffs assert in their brief that an employee suspected of theft of the inventory had been fired. This mitigating assertion is contradicted by the record, which shows that Singh testified that he did not have any idea whether the pharmacy technician had stolen drugs from the pharmacy.

After claiming employee theft, plaintiffs suggest that applying the statute in this context would subject pharmacists and pharmacies to discipline any time a pharmacy is burglarized. Plaintiffs argue that this court should adopt the tort rule that a person is generally not responsible for the criminal acts of third parties to this situation. Plaintiffs fail to cite any authority for the tort rule itself, let alone authority that it should be imported into this setting and apply to this record. As plaintiffs have failed to cite testimony indicating employee theft and failed to cite authority in support of their argument, the argument is waived on appeal. 134 Ill. 2d R. 341(e)(7).

C

Plaintiffs admit that they failed to comply with the reporting procedures for schedule V controlled substances mandated by the Illinois Controlled Substances Act. (See Ill. Rev. Stat. 1987, ch. 56½, pars. 1312(c)(3), (c)(5).) However, plaintiffs note that Singh's testimony establishes that this was because Singh was unaware of the procedures and that, with the exception of July 1989, plaintiffs complied with the required procedures after becoming aware of them. Thus, plaintiffs conclude that there were mere technical violations of the Illinois Controlled Substances Act.

■ In general, ignorance of the law does not excuse unlawful conduct. (See *People v. Sevilla* (1989), 132 Ill. 2d 113, 127, 547 N.E.2d 117, 123.) Plaintiffs do not cite any provision of the statutes at issue here or any case law that would require or even suggest an exception to this principle here. Accordingly, plaintiffs have failed to show that the DPR's decision was against the manifest weight of the evidence.

D

Plaintiffs contend it was against the manifest weight of evidence

to conclude that they failed to dispense Ritalin in good faith to six customers. The Pharmacy Practice Act requires that

"[a]ny person who sells or dispenses any drug, medicine or poison shall sell or dispense such drug, medicine or poison in good faith. 'Good faith', for purposes of this Section, has the meaning ascribed to it in subsection (u) of Section 102 of the 'Illinois Controlled Substances Act' approved August 16, 1971, as amended." (Ill. Rev. Stat. 1987, ch. 111, par. 4142.)

Section 102(u) of the Illinois Controlled Substances Act provides that

"application of the term to a pharmacist shall mean the dispensing of a controlled substance pursuant to the prescriber's order which in the professional judgment of the pharmacist is lawful. The pharmacist shall be guided by accepted professional standards including, but not limited to the following, in making the judgment:

(1) Lack of consistency of doctor-patient relationship,

(2) frequency of prescriptions for same drug by one prescriber for large numbers of patients,

(3) quantities beyond those normally prescribed,

(4) unusual dosages,

(5) unusual geographic distances between patient, pharmacist and prescriber,

(6) consistent prescribing of habit-forming drugs." Ill. Rev. Stat. 1987, ch. 56½, par. 1102(u).

In this case, the evidence adduced at the hearing supports the decision of the DPR. Kueter's expert testimony established that regarding the six customers at issue, there was a lack of consistency in the doctor-patient relationships, quantities beyond those normally prescribed, unusual geographic distances between the patients, plaintiffs and the prescribers, and the consistent prescribing of Ritalin, a habit-forming drug.

■ Plaintiffs note that the transactions took place over a span of two years. However, this fact appears to support the finding that there was a consistent prescribing of a habit-forming drug. Plaintiffs note that Singh testified that the Ritalin prescriptions were a small part of his business. However, given the record in this case, the purportedly small proportion of Stone Park Drugs business devoted to Ritalin sales is probably not sufficient, by itself, to render the DPR decision against the manifest weight of the evidence. Singh also testified that he contacted some of the prescribers. The hearing officer found this testimony not to be credible; again, this court defers to this determination. Moreover, even if Singh's testimony had been accepted

by the hearing officer, it should be noted that merely contacting a prescriber (without giving all pertinent information) would not warrant a reversal. (See *Ballin Drugs*, 166 Ill. App. 3d at 531, 519 N.E.2d at 1159.) Indeed, it is not enough for a pharmacist to merely contact the prescriber without considering the statutory guidelines. *Ballin Drugs*, 166 Ill. App. 3d at 525, 519 N.E.2d at 1155.

In sum, plaintiff has failed to show that the evidence adduced at the hearing did not clearly and substantially support the decision of the DPR in this matter.

### III

Finally, plaintiffs contend that the discipline imposed in this case is excessive. A reviewing court will not interfere with an agency's decision to impose a particular sanction unless the decision is unreasonable, arbitrary or unrelated to the purpose of the relevant statute. (See *Ballin Drugs*, 166 Ill. App. 3d at 531, 519 N.E.2d at 1159-60.) The purposes of the Pharmacy Practice Act are to regulate and control the practice of pharmacy in order to protect the public health, safety and welfare and to ensure that only qualified persons practice pharmacy in Illinois. (Ill. Rev. Stat. 1985, ch. 111, par. 4001; see *Fakhouri v. Taylor* (1993), 248 Ill. App. 3d 328, 333.) The basic purpose of the Illinois Controlled Substances Act is "to provide a system of control over the distribution and use of controlled substances." (Ill. Rev. Stat. 1987, ch. 56½, par. 1100.) In addition, the DPR is empowered to suspend licenses and registrations where violations such as those charged in this case have occurred. See, *e.g.*, Ill. Rev. Stat. 1987, ch. 56½, pars. 1304(a)(5), (a)(6), 1312(c)(3), (c)(5); Ill. Rev. Stat. 1987, ch. 111, pars. 4142, 4150(19); Ill. Rev. Stat. 1985, ch. 111, pars. 4006(a), 4031, 4267(B).

■ In this case, plaintiffs were found in violation of a number of different provisions of the Pharmacy Practice Act and the Illinois Controlled Substances Act. Some of the provisions were repeatedly violated. The charges were that plaintiffs failed to control the distribution and use of controlled substances and allowed an unqualified person to practice pharmacy. The hearing officer noted that in at least one other case involving similar but more egregious violations, revocation of licenses was recommended. That suspensions were recommended and imposed here suggests that the hearing officer, the State Board of Pharmacy and the DPR considered testimony by Singh that tended to mitigate the severity of the violations. Given the record in this case, the sanctions imposed were not unreasonable or arbitrary and advanced the purposes of the relevant statutes.

For all of the aforementioned reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

MANNING, P.J., and O'CONNOR, J., concur.