# Illinois Official Reports

## Appellate Court

***Parikh v. Division of Professional Regulation of the Department of Financial &
Professional Regulation*, 2014 IL App (1st) 123319**

| | |
|---|---|
| Appellate Court Caption | MAHESH PARIKH, M.D., Plaintiff-Appellant, v. THE DIVISION OF PROFESSIONAL REGULATION OF THE DEPARTMENT OF FINANCIAL AND PROFESSIONAL REGULATION and JAY STEWART, Director, Defendants-Appellees. |
| District & No. | First District, Second Division<br>Docket No. 1-12-3319 |
| Filed | November 4, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The order of the Director of the Department of Financial and Professional Regulation that plaintiff's medical license be indefinitely suspended for a minimum of one year based on the finding that plaintiff, a neurologist, touched the breasts and pelvic area of a 19-year-old college student for no clinical purpose during several neurological examinations was upheld, notwithstanding the fact that the order was contrary to the recommendation of the Department's Medical Disciplinary Board and the administrative law judge, since the Illinois Medical Practice Act did not require the Director to follow the recommendations of the Board, the Director could have found by clear and convincing evidence that plaintiff did inappropriately touch his patient, the Director's factual findings were not against the manifest weight of the evidence, the determination of the legal effect of the facts was not clearly erroneous, and the sanction imposed was neither unreasonable nor arbitrary. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CH-10974; the Hon. Franklin U. Valderrama, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Goldberg Law Group, LLC, of Chicago (Michael K. Goldberg, Robert A. Bauerschmidt, and Jenna E. Milaeger, of counsel), for appellant.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Nadine J. Wichern, Assistant Attorney General, of counsel), for appellees.

Panel

JUSTICE PIERCE delivered the judgment of the court, with opinion. Justices Neville and Liu concurred in the judgment and opinion.

**OPINION**

¶ 1    Appellant, Mahesh Parikh, M.D., a neurologist, appeals an order of administrative proceeding where the Director of the Division of Professional Regulation (Director) ordered that his medical license be indefinitely suspended for a minimum of one year. Parikh argues: (1) the Director does not have the authority under the Illinois Medical Practice Act of 1987 (225 ILCS 60/1 *et seq.* (West 2010)) to make factual finding and credibility determinations contrary to those made by the Medical Disciplinary Board of the Department (Board); (2) the Director's findings were against the manifest weight of the evidence; (3) the Director's finding on the legal effect of the facts is clearly erroneous; and (4) the Director abused his discretion by indefinitely suspending Parikh's medical license for at least a year. For the following reasons, we affirm the decision of the Director acting on behalf of the Illinois Department of Financial and Professional Regulation (Department).

¶ 2                                    BACKGROUND
¶ 3    The Department filed a two count complaint against Parikh, a neurologist licensed to practice medicine in Illinois, on October 29, 2010. Count I alleged that on July 29, 2010, during an office visit, Parikh examined L.K.'s breasts without wearing gloves and examined her pubic area by pressing on the area near the clitoris region in violation of section 22(A) of the Illinois Medical Practice Act of 1987 (Act) (225 ILCS 60/22(A)(5) (West 2010)). Count II alleged that on August 24, 2009, during an office visit, Parikh examined L.K.'s breasts by inserting an ungloved hand underneath her clothes, examined her vagina without wearing gloves, hugged L.K. at the end of the exam and examined L.K. without providing a gown in violation of section 22(A) of the Act (225 ILCS 60/22(A)(20) (West 2010)).

¶ 4    A hearing before an administrative law judge (ALJ) was held over three days in June, August and September of 2011. On November 9, 2011, the ALJ issued a report assessing the testimony of seven witnesses: L.K., the patient; her ex-boyfriend; her mother; Dane Michael Chetkovich, a neurologist and the Department's expert; Cynthia Monroe and Karen Hoff, Parikh's employees; and Parikh.

¶ 5    L.K. was a patient under Parikh's care and treatment from December 12, 2008 through August 24, 2009, for migraine headaches, anxiety and joint pain. L.K. was a 19-year-old

college student when she first began visiting Parikh's office. L.K. testified that the blinds on the window in the examination room door were closed during her eight appointments with Parikh in 2008 and 2009. L.K. testified that during her third visit to Parikh's office on March 20, 2009, she complained of breast tenderness along with other symptoms. With her permission to conduct a breast examination, Parikh stuck his hand down her shirt, using two or three fingers in a circular motion, and then squeezing her breasts with his hands and fingers. L.K. estimated that Parikh touched her breasts for 30 seconds to 1 minute. He performed this test once while she was sitting up and then again after she lay down. No one else was present during the examination.

¶ 6    L.K. indicated that a similar breast examination occurred during a March 24, 2009 follow-up visit although she did not complain of breast tenderness and Parikh did not ask permission. L.K. testified that similar incidents occurred during two separate visits in July 2009. In addition, L.K. claimed that during a July 29, 2009 visit, after conducting a similar breast exam, Parikh stuck his hand down her pants, underneath her underwear, with two or three fingers pushing into the pelvic area. L.K. felt uncomfortable about the examination, but trusted that Parikh knew what he was doing. Additionally, on a July 2009 visit, L.K. was accompanied by her then-boyfriend Brandon Olson because she felt uncomfortable seeing Parikh. Olson stated that he heard Parikh ask permission to examine L.K.'s breasts and then stuck his hand down her shirt. At that time Brandon looked away to give her some privacy.

¶ 7    L.K. also testified that during an August 2009 visit Parikh conducted another breast examination and again stuck his hand down her pants. After receiving permission to continue, he pushed into the pubic area above her clitoris. He then conducted yet another breast examination and later stuck his hand up the leg of her shorts, touching her vaginal lips. Once the exam was completed, L.K. told Parikh this would be her last visit since she was returning to college. Parikh asked if he could hug her and gave her a "really squeezy bear hug." L.K. told her mother, Tina, about the uncomfortable visit with Parikh. Tina spoke to L.K.'s primary care physician, with L.K.'s approval, about the nature of the examinations with Parikh. L.K.'s primary care physician recommended calling the police.

¶ 8    L.K. spoke with the police. The police report prepared stated that L.K. told officers that Parikh touched her breasts two appointments before the last one, but she testified that he first touched her breasts during the third appointment. L.K. told the Department that the first time Parikh touched her breasts was during the second appointment.

¶ 9    Brandon testified regarding the July 21, 2009, visit to Parikh's office with L.K. Brandon testified that he looked away out of respect for his girlfriend when Parikh's hand went down L.K.'s shirt. Parikh's back was to him at the time so he could not see the examination. Brandon testified that L.K. had complained about breast tenderness and that Parikh asked L.K. for her permission to perform the examination.

¶ 10   Tina, L.K.'s mother, testified that she accompanied L.K. to Parikh's office twice. During one of the appointments, she left the examination room when Parikh started asking questions about L.K.'s sexual history. Tina also testified about the conversation she had with L.K., L.K.'s primary care physician and the police.

¶ 11   Dr. Dane Michael Chetkovich, a board-certified neurologist, gave expert testimony for the Department. Dr. Chetkovich testified that typically, neither a breast nor a pelvic examination would be part of a neurological exam. Rather, if a breast or pelvic examination was indicated, a neurologist would refer the patient to a gynecologist or general practitioner. In the rare case

where a neurologist would be required to conduct a breast or pelvic exam, the doctor would document the reason for its necessity and report the results for diagnostic purposes. Dr. Chetkovich opined that based on a review of L.K.'s medical records, there was no reason for Parikh to perform a breast or pelvic exam. In addition, Dr. Chetkovich opined that the exams described by L.K. would be an inappropriate and unprofessional touching of L.K.'s breasts and pelvic area and that if the allegations were true, Parikh had failed to provide ethical care and treatment to L.K.

¶ 12    Parikh testified as an adverse witness and on his own behalf. He stated that he was L.K.'s neurologist between December 2008 and August 2009. He maintained throughout his testimony that he did not perform breast or vaginal examinations on L.K. He further maintained that either Tina, Brandon or one of his office assistants was in the examination room for part of L.K.'s visits. Parikh stated that his assistant Cynthia Monroe was present during the August 24, 2009, visit.

¶ 13    Dr. Parikh also called two of his office assistants to testify on his behalf. Monroe testified the examination room has blinds which are generally kept open. From where she sits in the office, Monroe can see into the examination room even when the door is closed, but cannot see past the corner of the examination table. She is always allowed to enter the examination room after knocking and does not wait for permission to enter. Dr. Parikh's other office assistant, Karen Hoff, gave substantially similar testimony on these points.

¶ 14    After reviewing the testimony and documentary evidence, the ALJ concluded that the Department failed to prove its charges by clear and convincing evidence and recommended that no action be taken against Parikh. The ALJ found that L.K. was confused about some points and demonstrated a naivety unusual for a woman of her age and educational background. The ALJ also found that her testimony was uncorroborated, except for Brandon's testimony regarding the one visit. The ALJ questioned Brandon's reliability given that he testified that he saw Parikh put his hand down L.K.'s shirt but then stated that Parikh's body blocked his view of the examination. The ALJ also found that Parikh testified credibly and calmly and his testimony was consistent with the medical records.

¶ 15    On December 29, 2011, the Board adopted the ALJ's findings of fact and conclusions of law in its recommendations to the Director. The Department then filed a motion asking the Director to take action contrary to the Board's recommendation. The Department argued that it proved the charges by clear and convincing evidence. The Department urged the Director to find that Parikh had inappropriately touched L.K. based on testimony presented and the conclusions that could be drawn therefrom, and find Parikh in violation of the Act.

¶ 16    On March 26, 2012, contrary to the Board's and ALJ's recommendation, the Director issued an order determining the evidence was sufficient to prove the charges against Parikh by clear and convincing evidence. The Director found that Parikh "overstepped his relationship with a young, vulnerable patient and fondled her breasts and touched her pelvic area for no clinical purpose during numerous neurological examinations" and "even fondled [L.K.'s] breasts under the guise of a legitimate examination in the presence of the patient's boyfriend." The Director found that L.K.'s naivety did not dispel her clear and consistent testimony of the events occurring in Parikh's office on multiple occasions. The Director also found that Parikh testified that he did not recall any of the office visits with L.K. with any specificity, which lessened the weight of his denials in the face of the testimony from L.K. and Brandon. Further, the Director found that Parikh's employees' testimony should be given less weight in light of

their employment relationship and financial dependence on Parikh keeping his license to practice medicine, as well as the fact that they were not in the examination room for L.K.'s visits. The Director concluded:

> "Respondent abused his position of trust and took advantage of his patient. L.K. provided consistent, detailed testimony regarding six separate office visits during which Respondent fondled her breasts and pelvic region. I find no reason to believe the patient was mistaken or confused about what happened. Additionally, the Department's expert found the Respondent's actions to serve no medical purpose and to be unprofessional and unethical. Further, I find no motive on the part of the patient to fabricate this story. There is no evidence that L.K. is unstable or suffered from a mental illness that would render her unreliable. Instead, the patient and her mother state the sole reason they came forward with a complaint was to protect other young women."

Accordingly, the Director ordered that Parikh's medical license be indefinitely suspended for a minimum of one year.

¶ 17 Parikh immediately filed a complaint for administrative review and an emergency motion to stay the Director's order in the circuit court, which was denied. On April 20, 2012, Parikh filed a timely notice of interlocutory appeal to this court, and on September 19, 2012, we affirmed the judgment of the circuit court denying the stay. *Parikh v. Division of Professional Regulation of the Department of Financial & Professional Regulation*, 2012 IL App (1st) 121226. The trial court upheld the decision of the Director on October 17, 2012. Parikh now appeals from the Director's finding.

¶ 18                                     ANALYSIS

¶ 19 Before we reach the merits of Parikh's arguments, we must discuss the appropriate standard of review in this case. Judicial review pursuant to the Administrative Review Law (735 ILCS 5/3-101 (West 2010)) provides that this court review the Director's decision and not the decision of the ALJ or the circuit court. *Lindemulder v. Board of Trustees of the Naperville Firefighters' Pension Fund*, 408 Ill. App. 3d 494, 500 (2011). The standard of review we apply depends on the question presented. *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455 (2005). When an issue of pure law is raised, we review *de novo*. *Village Discount Outlet v. Department of Employment Security*, 384 Ill. App. 3d 522, 525 (2008). When the issue raised is one of fact, we will only ascertain whether such findings of fact are against the manifest weight of the evidence. *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 386-87 (2010). A mixed question of law and fact is reviewed under the clearly erroneous standard. *Heabler v. Illinois Department of Financial & Professional Regulation*, 2013 IL App (1st) 111968, ¶ 17. Mixed questions of fact and law are "questions in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard," or to put it another way, whether the rule of law as applied to the established facts is or is not violated. *Pullman-Standard v. Swint*, 456 U.S 273, 289 n.19 (1982).

¶ 20 Parikh first argues that the Director lacked the authority under the Act to make factual findings and credibility determinations contrary to those made by the Board. This is a question of law. Therefore, we review this issue *de novo*. *Village Discount Outlet*, 384 Ill. App. 3d at 525.

¶ 21    The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature. *MD Electrical Contractors, Inc. v. Abrams*, 369 Ill. App. 3d 309, 312 (2006). Generally, the statutory language is the best evidence of the legislature's intent, and such language should be given its plain and ordinary meaning. *Paris v. Feder*, 179 Ill. 2d 173 (1997). In interpreting a statute, we must construe words and phrases in light of other relevant portions of the statute so that, if possible, no term is rendered superfluous or meaningless. *West Suburban Bank v. City of West Chicago*, 366 Ill. App. 3d 1137, 1140 (2006). Moreover, "[a] court is not permitted to ignore the plain meaning of the statute by reading into it exceptions, limitations, or conditions that the legislature did not express." *Forest Preserve District v. Loren & Gisela Brown Family Trust*, 323 Ill. App. 3d 686, 692 (2001). "Only where the language of the statute is ambiguous may the court resort to other aids of statutory construction." *People v. Glisson*, 202 Ill. 2d 499, 505 (2002).

¶ 22    The Director, in his written order, discussed the power bestowed on the Director to make findings in contravention of the Board's recommendation and cited to section 44 of the Act. An agency's decision on a question of law is not binding on a reviewing court. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200 (2008).

¶ 23    Section 44 of the Act states:

> "None of the disciplinary functions, powers and duties enumerated in this Act shall be exercised by the Department except upon the action and report in writing of the Disciplinary Board.
>
> In all instances, under this Act, in which the Disciplinary Board has rendered a recommendation to the Director with respect to a particular physician, the Director shall, in the event that he or she disagrees with or takes action contrary to the recommendation of the Disciplinary Board, file with the Disciplinary Board and the Secretary of State his or her specific written reasons of disagreement with the Disciplinary Board. Such reasons shall be filed within 30 days of the occurrence of the Director's contrary position having been taken.
>
> The action and report in writing of a majority of the Disciplinary Board designated is sufficient authority upon which the Director may act.
>
> Whenever the Director is satisfied that substantial justice has not been done either in an examination, or in a formal disciplinary action, or refusal to restore a license, he or she may order a reexamination or rehearing by the same or other examiners." 225 ILCS 60/44 (West 2010).[1]

¶ 24    Parikh argues that the plain meaning of the first paragraph of section 44 requires the Director to accept the Board's recommendation. We disagree. The plain language of the first paragraph prohibits the Department from engaging in disciplinary action without a written report from the Board. Further, the plain and ordinary meaning of the second paragraph of section 44 states that where the Director disagrees with or takes action contrary to the recommendation of the Board, within 30 days of taking action contrary to the Board's recommendation, the Director shall file with the Board his or her specific written reasons of disagreement. The second paragraph permits the Director to "disagree with" the Board. It also clearly allows the Director to "take action" contrary to the recommendation "of the

---

[1]Amended by Public Act 97-622, § 10 (eff. Nov. 23, 2011) to vest this authority in the Secretary of the Department.

Disciplinary Board." The third paragraph of this section gives the Director the authority to act upon the Board's recommendation where the majority of the Board makes the recommendation. The fourth paragraph of section 44 does not similarly preclude the Director from making findings contrary to the Board's recommendation: it allows the Director the opportunity to send the case back for a reexamination or a rehearing where the Director finds the proceeding before the ALJ or the Board did not comply with due process. See *Stojanoff v. Department of Registration & Education*, 79 Ill. 2d 394 (1980); *Smith v. Department of Registration & Education*, 412 Ill. 332 (1952).

¶ 25       We find no language in the Act that requires the Director to follow the Board's recommendations, nor does Parikh cite to any. On the contrary, other sections of the Act support our conclusion that the Director may act in contravention of the Board. Both sections 40 and 35 speak of the Board providing its recommendations to the Director. Section 40 states that, "[a]t the expiration of the time allowed for filing a motion for rehearing, *the Director may take the action recommended by the Disciplinary Board*." (Emphasis added.) 225 ILCS 60/40 (West 2010). Section 35, which explains the procedure for disciplinary proceedings, states that "[t]he hearing officer shall report his findings and recommendations to the Disciplinary Board within 30 days of the receipt of the record. The Disciplinary Board shall have 60 days from receipt of the report to review the report of the hearing officer and present their findings of fact, conclusions of law and *recommendations* to the Secretary." (Emphasis added.) 225 ILCS 60/35 (West 2010). Therefore, we conclude that legislative authority grants the Director the authority to agree and act on the majority of the Board's recommendation or to disagree with the findings and recommendations of the Board subject to the standard of judicial review applicable to the nature of the action taken.

¶ 26       Parikh next argues that the final decision of the Director must be reversed because the Director shifted the burden of proof when he found that Parikh was not credible because he denied the allegations being made by the patient. Parikh points to the Director's statement in his written order that reads, "I find the Respondent's testimony less than credible due to the repeated consistent statements from L.K. and the corroborating eyewitness account from her ex-boyfriend."

¶ 27       We disagree that this statement is indicative of improper burden shifting. It is the Director's function, as the fact finder, to weigh the evidence, determine the credibility of the witnesses, and resolve conflicts in the evidence. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 540 (2006). The Director, in assessing the credibility of the witnesses who testified before the ALJ, merely found L.K. more credible than Parikh.

¶ 28       Defendant also argues that the Director's factual findings were against the manifest weight of the evidence. Findings of fact and credibility determinations on review are held to be *prima facie* true and correct and should not be overturned unless they are against the manifest weight of the evidence. *Cinkus*, 228 Ill. 2d at 210. An administrative agency's factual determinations are against the manifest weight of the evidence if the opposite conclusion is clearly evident. *Id.* It is not our function to reevaluate witness credibility or resolve conflicting evidence. *Morgan v. Department of Financial & Professional Regulation*, 374 Ill. App. 3d 275, 288-89 (2007). If the issues are merely ones of conflicting testimony or credibility of witnesses, the determinations of the agency should be upheld. *Keen v. Police Board*, 73 Ill. App. 3d 65 (1979).

¶ 29    Because we cannot reweigh the evidence or reassess the credibility of the witnesses on review, our sole inquiry is whether anything in the record supports the Director's decision that the facts supported, by clear and convincing evidence, that Parikh inappropriately touched L.K. several times during her neurological examinations. We find that the Director's factual findings are not against the manifest weight of the evidence. In his order, the Director clearly states that his decision is based on the "evidence presented at the hearing" before the ALJ and that he considered "all of the evidence and testimony." The testimony of L.K., coupled with that of her boyfriend and her mother, provides enough evidence for us to conclude that the Director could have found by clear and convincing evidence that Parikh inappropriately touched L.K.'s breasts and pelvic area. L.K. testified that Parikh touched her breasts and pelvic area on several occasions. Brandon's testimony corroborated L.K.'s testimony, although he did not actually see Parikh's hand on her breasts. L.K.'s mother Tina testified that L.K. came to her about Parikh because she was uncomfortable with the way Parikh was touching her. Based on the testimony in the record, it is not "clearly apparent" that Parikh did not inappropriately touch L.K.'s breasts. Although the Director weighed the conflicting evidence differently and made credibility assessments in disagreement with the ALJ, the Director's findings are to be afforded deference even when his findings differ from those of the ALJ. *Wilson v. Department of Professional Regulation*, 317 Ill. App. 3d 57 (2000). The fact that we may have found otherwise is not sufficient to find that the Director's decision is against the manifest weight.

¶ 30    Parikh also argues that the final decision of the Director must be reversed because it was not based on the evidence and therefore was against the manifest weight of the evidence. Parikh actually misstates the standard of review with respect to this argument. We review pure questions of fact under the manifest weight standard. *Cinkus*, 228 Ill. 2d at 210. The Director's decision on the legal effect of a given set of facts–such as whether Parikh's conduct constituted a violation of the Act–presents a mixed question of law and fact and is reviewed under the clearly erroneous standard. *Heabler*, 2013 IL App (1st) 111968, ¶ 17. The clearly erroneous standard of review lies between the manifest weight of the evidence standard and the *de novo* standard, and lends some deference to the agency's decision. *Lombard Public Facilities Corp. v. Department of Revenue*, 378 Ill. App. 3d 921 (2008). The Board's decision will be deemed clearly erroneous only where, upon review of the entire record, we are "left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 393 (2001).

¶ 31    The Director made a determination as to the legal effect of the facts, as we have already discussed. Specifically, the Director found that Parikh abused his position of trust and took advantage of his patient during six separate office visits when he fondled L.K.'s breasts and pelvic region. Based on this conduct, the Director found that Parikh engaged in dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public in violation of section 22(A)(5) of the Act (225 ILCS 60/22(A)(5) (West 2010)) and engaged in immoral conduct in the commission of any act including but not limited to commission of an act of sexual misconduct related to the licensee's practice in violation of section 22(A)(20) of the Act (225 ILCS 60/22(A)(20) (West 2010)).

¶ 32    As previously discussed, the Director's factual findings are not against the manifest weight of the evidence. Accordingly, the determination regarding the legal effect of the facts, that based on his conduct plaintiff violated the Act, was not clearly erroneous.

¶ 33     Finally, we address Parikh's argument that the sanction imposed must be reversed because it is overly harsh. As previously stated, the Director suspended Parikh's medical license indefinitely but for at least one year.

¶ 34     A reviewing court defers to the administrative agency's expertise and experience in determining what sanction is appropriate to protect the public interest. *Massa v. Department of Registration & Education*, 116 Ill. 2d 376, 388 (1987). A reviewing court will not interfere with an agency's decision to impose a particular sanction unless the decision is unreasonable, arbitrary or unrelated to the purpose of the relevant statute. *Singh v. Department of Professional Regulation*, 252 Ill. App. 3d 859, 870 (1993).

¶ 35     Prior to a recent amendment, section 22 of the Act provided that the Department "may revoke, suspend, place on probationary status, refuse to renew, or take any other disciplinary action as the Department may deem proper with regard to the license or visiting professor permit of any person issued under this Act to practice medicine" based upon "dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public" and "[i]mmoral conduct in the commission of any act including, but not limited to, commission of an act of sexual misconduct related to the licensee's practice." 225 ILCS 60/22(A), (A)(5), (A)(20) (West 2010). The Act now reads that the Director "may revoke, suspend, place on probation, reprimand, refuse to issue or renew, or take any other disciplinary or non-disciplinary action as the Department may deem proper." 225 ILCS 60/22(A) (West 2012).

¶ 36     Parikh argues that, even assuming all of the factual findings of the Director were true, similarly situated physicians were given six-month suspensions in *Reddy v. Department of Professional Regulation*, 336 Ill. App. 3d 350 (2002), and *Pundy v. Department of Professional Regulation*, 211 Ill. App. 3d 475 (1991), where there were far more offending incidents, allegations of intercourse and a much greater span of time involved.

¶ 37     In *Reddy*, a psychiatrist professed his love for his patient during a psychiatric treatment session, moved her into the home that he shared with his wife and children, divorced his wife, and married his patient. *Reddy*, 336 Ill. App. 3d at 352. After an administrative hearing, the ALJ found that Reddy's behavior warranted discipline because the evidence showed that his behavior was unethical, unprofessional, and immoral under the Act, and Reddy suffered from a mental illness that resulted in his inability to practice medicine with a reasonable degree of judgment under the Act. The ALJ recommended that Reddy's medical license be placed on two years' probation "with certain restrictions on plaintiff's practice of medicine." *Id.* The Board accepted the ALJ's findings, but based on the "egregious" nature of the offense, recommended a more severe penalty of a six-month suspension of his medical license. *Id.* The Department accepted the Board's recommendation and issued an order suspending Reddy's license for six months and prohibited Reddy from supervising other medical practitioners. *Id.* This court affirmed the Department's order and held that the Department did not abuse its discretion in imposing the six-month suspension. *Id.*

¶ 38     In *Pundy v. Department of Professional Regulation*, 211 Ill. App. 3d 475, 479 (1991), a psychiatrist began a sexual relationship with one of his patients. During the course of their relationship, the psychiatrist hired the patient to work in his office, eventually allowing her to act as a "co-therapist" and to be present during other patients' psychiatric sessions. *Id.*

¶ 39     Multiple psychiatrists testified as expert witnesses on behalf of Pundy. These experts testified that Pundy had not violated any medical ethics by entering into a sexual relationship

with his patient. *Id.* at 480. The ALJ determined that there was no credible evidence to support a finding of a clear and convincing violation of the Act and recommended that no punishment be imposed. *Id.* However, the Board declined to follow the ALJ's recommendation, finding that Pundy was guilty of unprofessional conduct likely to harm the public and recommended that the Department suspend his medical license for six months, followed by a two-year probationary period. *Id*. The Department accepted the Board's recommendations and ordered the punishment recommended. *Id.*

¶ 40      On appeal, Pundy argued that the sentence was arbitrary and overly harsh. *Id.* at 488. Despite his arguments that he had been exploited by his patient and had taken steps to mitigate any harm done to his patient by terminating the psychiatrist-patient relationship, we found that the Department did not abuse its discretion in suspending Pundy. *Id.*

¶ 41      We find *Reddy* and *Pundy* factually distinguishable. Both Reddy and Pundy, psychiatrists, engaged in consensual, loving relationships with partners that happened to be patients. In this case, Parikh used his position of trust and authority as L.K.'s physician to violate her by touching her breasts and pelvic area. Parikh's actions were more egregious than those in *Reddy* or *Pundy*, and the punishment imposed reflects that.

¶ 42      Finally, we consider whether the punishment was unrelated to the purpose of the statute. The purpose of the Act is to "protect the public health and welfare from those not qualified to practice medicine." *Ikpoh v. Department of Professional Regulation*, 338 Ill. App. 3d 918, 926 (2003).

¶ 43      The Director in this case found that Parikh abused his position of trust as a physician and took advantage of his patient. In addition, the Director found that Parikh's actions served no medical purpose. Clearly, this is the type of conduct subject to disciplinary regulation that the statute contemplates. Therefore, we do not find that a one-year mandatory suspension with an indefinite duration thereafter is an unreasonable or arbitrary penalty, nor do we find it to be unrelated to the statute, where Parikh can petition to restore his license one year from the date of the Director's order.

¶ 44                             CONCLUSION

¶ 45      For the foregoing reasons, we affirm the judgment of the Department.

¶ 46      Affirmed.