2021 IL App (1st) 200077-U

No. 1-20-0077

Order filed May 18, 2021.

Modified upon denial of rehearing August 3, 2021.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| POOJA KHUNGAR, M.D., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 18 CH 8795 |
| THE ILLINOIS DEPARTMENT OF FINANCIAL AND | ) | |
| PROFESSIONAL REGULATION and JESSICA | ) | |
| BAER, in her official capacity as Director of the Illinois | ) | The Honorable |
| Department of Financial and Professional Regulation, | ) | Pamela McLean Meyerson, |
| | ) | Judge Presiding. |
| Defendants-Appellees. | ) | |

_____

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*: The Department proved its case to suspend the appellant's medical license by clear and convincing evidence. The administrative agency's decision was neither against the manifest weight of the evidence, nor clearly erroneous. The appellant's motions to dismiss were properly denied, and the appellant failed to establish that evidence at the administrative hearing was erroneously admitted. Finally, the appellant's due process rights were not violated, and the

sanction imposed was not an abuse of discretion. This court affirmed the circuit court's judgment affirming the administrative agency's decision to suspend the appellant's medical license.

¶ 2 Following an administrative hearing, the Medical Disciplinary Board (Board) of the Illinois Department of Financial and Professional Regulation (Department) and its Director indefinitely suspended the Illinois medical license of Dr. Pooja Khungar, and the circuit court affirmed the Director's decision. Dr. Khungar now appeals arguing the Department failed to prove by clear and convincing evidence that Dr. Khungar engaged in unprofessional conduct, was mentally ill, and misrepresented certain facts on a credential form in violation of the Medical Practice Act of 1987 (the Medical Practice Act) (225 ILCS 60/1 *et seq.* (West 2018)), and as a result, the agency's decision was against the manifest weight of the evidence and clearly erroneous. She maintains the agency relied on evidence involving a private relationship that the Medical Practice Act does not govern, as well as inadmissible evidence. Dr. Khungar also argues several motions to dismiss were improperly denied and her due process rights were violated in a variety of ways, most notably when two different Administrative Law Judges (ALJ) presided over the license suspension hearing. Finally, she challenges the sanction of suspending her license indefinitely for a minimum of 18 months. We affirm.

¶ 3                                 BACKGROUND

¶ 4 The record shows the Department filed a seven-count, third-amended administrative complaint against Dr. Khungar, a practicing pediatrician educated at Yale University and the University of Illinois Medical School, after being notified that she was engaging in strange behavior violative of the Medical Practice Act. Starting in May 2017 and concluding in November 2017, an evidentiary hearing was then held over the course of 21 days with 41 witnesses testifying. Much of the hearing evidence related to Dr. Khungar's problematic conduct at several jobs from which she was fired, as well as her one-sided romantic aspirations towards

and legal entanglements with a man named Monu Bedi, a Harvard-educated, tenured law professor employed by DePaul University College of Law. By her own admission, Dr. Khungar associated with Bedi but never had any formal dating or sexual relationship, nor was he in her medical care. The hearing evidence revealed that her apparent obsession with this man and inability to respect his boundaries and those of her fellow colleagues, physicians, and patients infected her professional life to the extent that she was unable to effectively practice as a doctor.

¶ 5    Briefly stated, evidence showed that Dr. Khungar's troubles leading to license suspension began in the summer of 2012, when she met Bedi at a social networking event for young professionals. For two months, they got together a handful of times as friends and with others, but their platonic relationship soon turned sour. Over the course of several months in September and October 2012, Dr. Khungar sent Bedi some 150 communications, via email, text, LinkedIn, and Facebook, before Bedi asked that she stop contacting him. Despite requests to cease contact, Dr. Khungar continued to send hundreds of communications (over 300) from 2012 to 2014. Many of the messages were inappropriate and nonsensical one-way conversations that were sexual or romantic in tone, and showed Dr. Khungar was monitoring and/or stalking Bedi. By way of example, in April 2013, she wrote: "From 3 blocks away u looked stressed as usual. U look stressed out on the phone *** Hope it's at least over a blonde and not taxes! And not the gay one, they are stressful when they sleep with a new guy." In October 2013, she wrote: "I will take $15,000 not to tell all of Chicago you have a nose job." In January 2014, she wrote: "Also sorry for harassing you. **** I stab children in their sleep in the hospital secretly and also look at the teenagers for random erections with hope in my heart!" In January 2014, she wrote, "She is a dumb ugly white bitch. Hope you die in her skinny gross arms."

¶ 6      In addition to these communications, Dr. Khungar contacted Bedi's employer, DePaul, and his alma mater, Harvard, claiming that he'd made improper advances, was unprofessional, of concern to female law students (specifically, ones who were "eastern Indian," "overweight," and who "had limited sexual experience"), and that it was *he* who was sexually harassing *her*, going so far as to tell DePaul's dean that, per, Bedi, she'd never seen an erect penis. (Incidentally, the record shows there were no complaints during the DePaul dean's tenure about Bedi).

¶ 7      All these unwanted communications resulted in Bedi filing for a stalking and no-contact order of protection against Dr. Khungar in 2014. In April of that year, following a non-evidentiary hearing, the circuit court entered a plenary protective order against Dr. Khungar, effective two years, that prohibited Dr. Khungar from stalking Bedi and having contact with him, coming near his residence or place of employment, and contacting colleagues, staff, and students at Harvard and DePaul law schools. Dr. Khungar stipulated to the order, and the court later extended it through July 2017.

¶ 8      In 2014, Bedi filed a motion claiming that Dr. Khungar had violated the protective order by contacting DePaul's dean. At the Department's administrative hearing, the dean of DePaul testified to that fact, stating that Dr. Khungar had contacted him about the original grievance underlying the present disciplinary action. In another legal filing, Bedi noted Dr. Khungar had improperly contacted his father, also a physician, through the medical switchboard. Relevant for the purposes of this appeal, two deputy sheriffs also testified that when Dr. Khungar was in the domestic violence courthouse on the alleged protective order violations, she was believed to be taking photographs, specifically of Bedi. As the deputy sheriffs attempted to investigate the matter, Dr. Khungar became uncooperative, belligerent, and struck the deputy's hand. She resisted arrest by flailing her arms and had to be forcibly handcuffed before being taken to the

lockup. There, she announced that the deputies had sexually transmitted diseases and yelled she hoped their children developed cancer and were brought to her for treatment so she could let them die. She screamed that the deputies were fat, incompetent, and stupid. This behavior resulted in a misdemeanor complaint being filed against Dr. Khungar for battery and resisting a peace officer. The complaint, however, was dismissed by agreement when Dr. Khungar formally apologized to the deputy sheriff and agreed to abide by other conditions.

¶ 9       During this period, from spring 2013 to spring 2014, Dr. Khungar had been employed as a pediatrician at Aunt Martha's Youth Service Center. While there, Dr. Khungar recounted to patients and staff details of her legal entanglements with Bedi, and despite being asked to stop, she continued. She also made staff members uncomfortable with her divulging of personal information, "unprofessional demeanor" and behavior toward them, creating a hostile workplace. Given those facts, Aunt Martha's placed Dr. Khungar on a corrective action plan in March 2014. Several months later, in May 2014, Aunt Martha's gave Dr. Khungar the chance to resign, having found credible a medical assistant's complaint that she felt harassed by Dr. Khungar. Ultimately, Dr. Khungar declined the offered resignation and was immediately suspended without pay.

¶ 10      That same month, during a human resources meeting with Aunt Martha's CEO/president and CFO, Dr. Khungar insulted her supervisor as lacking knowledge, skill, and experience to be a medical director, and she inappropriately parodied an African American staff member's accent and speech inflection. Aunt Martha's found she showed "persistent and ongoing misconduct," with "frequent, ongoing, inappropriate and unacceptable disclosures and remarks to patients and staff concerning [her] personal life, relationships and problems that disrupted the workplace," and she continued to make disparaging comments to and about staff, creating a hostile work

environment. The human resources director testified that Dr. Khungar had violated Aunt Martha's code of conduct. Accordingly, Aunt Martha's terminated Dr. Khungar in May 2014.

¶ 11    Several months later in July 2014, Dr. Khungar went on to serve as a pediatrician at Access Community Health Network without disclosing her previous termination from Aunt Martha's. There, many of the same problems followed. Dr. Khungar similarly claimed to parents of patients and staff that Bedi (her "ex-boyfriend") was stalking her, suing her, bankrupting her, and trying to take away her license. In 2015, Dr. Khungar was found to have accessed information from patient records for personal use in violation of health privacy laws so as to interfere with another staff member. For this behavior, she was issued a "final warning" that she could face disciplinary action or termination. She then had numerous complaints from staff and patients about her disruptive behavior. Access documented four complaints from parents about inadequate care by Dr. Khungar (like the failure to observe a cotton swab stuck in a child's ear and to refer a child with severe abdominal pain to the emergency room for what ultimately turned out to be an appendicitis). Staff members complained that she harassed them on Facebook, made racially insensitive comments, and she was said to have interfered with patient care (for example, making an addendum to the charts of patients she had not seen), all of which prompted Access to issue a 90-day notice of termination in November 2016.

¶ 12    Following that, Dr. Khungar insinuated she would burn down her employer's building by querying what would happen if Access caught fire. At a December 2016 human resources meeting on this matter, Dr. Khungar acknowledged stating "[w]hat will happen if the place blows up when I leave," which prompted her termination that same day. At the time of the administrative hearing, the Kedzie Access still had a security guard due to ongoing concerns as to Dr. Khungar. Additionally, while at Access, Dr. Khungar failed to disclose that a disciplinary

action related to her license had been instituted and was pending against her despite a direct inquiry as to that issue on a credential form.

¶ 13    Given this behavior, fellow pediatrician Dr. Tara De Jesus who had worked with Dr. Khungar, declined to give her a requested reference letter for another job. Dr. De Jesus also testified to many of the incidents at Access about Dr. Khungar's unprofessional conduct involving both patients and staff. After declining the reference letter request, Dr. De Jesus described Dr. Khungar as leaving Facebook comments accusing Dr. De Jesus of mistreating individuals at Access and also denigrating her skills as a doctor. Dr. Khungar called Dr. De Jesus and her husband racists, also doing so via Facebook and on her husband's employment site. This led to the various parties filing protective orders against each other.

¶ 14    Meanwhile, in 2014, Bedi had submitted a letter of complaint about Dr. Khungar to the Department in charge of medical licenses, and the Department subsequently began investigating her. See 20 ILCS 2105/2105-10, 2105-15 (West 2018); 225 ILCS 60/1 (West 2018). The Department ordered psychiatrist Dr. Stephen Dinwiddie to evaluate Dr. Khungar. He testified that to a reasonable degree of medical certainty she had an "other specified personality disorder" with paranoid narcissistic features making her prone to conflict at work, which affected her ability to assess and treat patients. He noted that medical teams needed to have free communication and trust, but a disruptive, antagonistic personality like Dr. Khungar's could lead to poor patient care outcomes. This also was because she couldn't cooperate and interact in a collegial and professional manner. He opined this was a mental impairment affecting her ability to practice medicine with reasonable judgment, skill, and safety. Dr. Dinwiddie recommended that she complete an in-patient treatment program before returning to practice. In addition, he

noted "she would fit into the psychiatric phenomenon" of "stalking" which was a manifestation of her personality disorder.

¶ 15    Similarly, the Department's chief medical coordinator, testifying as an expert in the field of professional responsibility, opined to a reasonable degree of medical certainty that Dr. Khungar's disruptive conduct at work and in public had breached the standard of conduct of the profession.

¶ 16    As set forth, the Department then filed an administrative complaint against Dr. Khungar seeking to suspend her license, and this culminated with the third-amended, seven-count complaint presently before us. The Department alleged various violations of the Medical Practice Act relating to Dr. Khungar's harassing conduct towards Bedi and the sheriff deputies (count 1), her personality disorder (count 2), terminations from Access and Aunt Martha's (counts 3 and 6, respectively), credentialing forms from 2014 and 2016 inquiring as to pending disciplinary actions (counts 7 and 4, respectively), and her conduct toward Dr. De Jesus (count 5). As to all these counts, the Department alleged that Dr. Khungar violated the Act by "[e]ngaging in dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public." See 225 ILCS 60/22(A)(5) (West 2018). The Department further alleged that Dr. Khungar's mental illness or disability (count 2) made it impossible to practice medicine with reasonable judgment, skill, and safety (see 225 ILCS 60/22(A)(27) (West 2018)), and she also made false, fraudulent, or deceptive statements on the credentialing forms connected with her medical practice (counts 7 and 4) (see 225 ILCS 60/22(A)(31) (West 2018)).

¶ 17    A lengthy administrative hearing followed revealing the facts detailed above. Fifteen witnesses testified for the Department, while 28 witnesses testified for Dr. Khungar.[1] Dr.

_____

[1]Dr. Khungar and the Department's chief medical coordinator each testified for the Department's case-in-chief and also Dr. Khungar's case.

Khungar's witnesses included doctors and colleagues from previous jobs and also doctors and colleagues from Aunt Martha's and Access with whom Dr. Khungar worked directly. They asserted that Dr. Khungar was of good character, a good doctor, and professional (with some testifying they entrusted their own children to her care), although many were unaware of the facts leading to the Department's complaint. As to the threat at Access, respondent's own witness, Marcia Zuniga, a Medical Assistant at Access, testified that Dr. Khungar said something to the effect that she would, " ' Light fire to this place,' " and at some point, Zuniga also saw respondent with a just-lit match for no apparent reason, although Zuniga claimed she felt no threat.

¶ 18    Respondent was also evaluated by a psychiatrist of her own choice, Dr. Monica Argumedo, who concluded contrarily that to a reasonable degree of medical certainty, Dr. Khungar did not have a personality disorder making her mentally impaired and she could safely practice medicine with reasonable judgment and skill. She opined that Dr. Khungar's relationship with Bedi was destabilizing but did not impair Dr. Khungar's ability to practice medicine. Dr. Argumedo testified that she had reviewed the amended complaints and Dr. Dinwiddie's evaluation, but that did not change her opinion. On cross-examination, however, Dr. Argumedo stated she was unaware of many of the exhibits relating to Dr. Khungar's repeat text messages to Bedi or documents underlying her terminations. For example, Dr. Argumedo acknowledged that during the four-hour examination of Dr. Khungar, they did not discuss any information related to Aunt Martha's employment, and Dr. Argumedo did not have the full information pertaining to Access.

¶ 19    ALJ Michael Lyons presided over the first three days of trial, hearing part of the Department's case, consisting only of Dr. Khungar's adverse testimony. ALJ Lyons then retired

and was replaced by ALJ Erik Gruber, who oversaw the remaining 18 days of trial, hearing some 40 other witnesses, along with Dr. Khungar herself. Respondent was represented by counsel through some of the trial but in the middle of proceedings on September 12, 2017, she ordered her counsel to withdraw and proceeded *pro se* for the remainder.

¶ 20    ALJ Gruber issued a 102-page report and recommendation. He found Dr. Khungar was not credible and exhibited inconsistencies in her testimony, interruptions, and "inappropriate attempts to distract and disturb the Department's witnesses." He concluded the Department had proven by clear and convincing evidence count 1, part of count 2, and counts 3 - 6, but had not proven count 7 and part of count 2. As to count 7, ALJ Gruber concluded the Department failed to prove Dr. Khungar made false, fraudulent, or deceptive statements on her 2014 credentialing form (see 225 ILCS 60/22(A)(31) (West 2018)). As to count 2, while ALJ Gruber concluded the Department had proved Dr. Khungar's mental illness or disability made it impossible to practice medicine with reasonable judgment, skill, and safety (see 225 ILCS 60/22(A)(27) (West 2018)), ALJ Gruber held "such mental illness or disability is not the equivalent of being engaged in dishonorable, unethical or unprofessional conduct," under section 22(A)(5), and as such, the Department had not proven its case in that regard on count 2. Given that ALJ Gruber held all other counts proven, he recommended that Dr. Khungar's license to practice as a physician and surgeon be suspended indefinitely for a minimum of 18 months.

¶ 21    The Board then reviewed the record and adopted the ALJ's factual findings, legal conclusions, and recommendations. See 225 ILCS 60/44 (West 2018). Dr. Khungar filed a motion to reconsider. On June 13, 2018, the Department's Director adopted the ALJ and the Board's decisions, issuing a final administrative decision, thereby denying Dr. Khungar's motion to reconsider. Dr. Khungar filed a complaint for administrative review, and the circuit court

affirmed the Director's decision. The circuit court also denied Dr. Khungar's motion to rehear, modify, or vacate the circuit court's order. This appeal followed.

¶ 22                                              ANALYSIS

¶ 23    At the outset, we address the Department's motion to strike Dr. Khungar's brief and dismiss the appeal as violative of our supreme court rules, which are not mere suggestions but compulsory. See *U.S. Bank Trust National Association v. Junior*, 2016 IL App (1st) 152109, ¶ 17. As the Department observes, Dr. Khungar's jurisdictional statement is woefully deficient. Illinois Supreme Court Rule 341(h)(4) (eff. May 25, 2018) requires the appellant to identify the facts of the case, together with record citations, which bring it within the rule conferring jurisdiction, as well as the date of the order being appealed from and any other facts to show the appeal is timely. See *id*. Dr. Khungar's brief does none of this, as it simply provides that we can review the appeal under the "Administrative Review Act," and Supreme Court Rule 303 (eff. July 1, 2017) (dealing with appeals from final judgments).

¶ 24    Dr. Khungar's statement of facts is similarly deficient. Rather than presenting facts "stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal," as required by Rule 341(h)(6), the fact section includes inaccuracies, argument, and cites to evidence outside the record, while also failing to provide appropriate references to the pages of the record. This is demonstrably insufficient given the sizable record, which is over 4,000 pages. Finally, the Department asserts, and we agree, that many of Dr. Khungar's arguments have been forfeited, and to the extent Dr. Khungar raises new arguments in her reply brief, we will not consider them. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

¶ 25    Nonetheless, striking an appellate brief is a harsh sanction and only appropriate when the alleged violations hinder our review. *In re Detention of Powell*, 217 Ill. 2d 123, 132 (2005). Having examined the briefs and record, we can't say this is such a case, although we do note throughout our order the many instances where Dr. Khungar improperly attempts to place the burden of argument and research on this court. Knowing this, yet despite the deficiencies in Dr. Khungar's brief, we turn to consider the merits of this appeal involving the suspension of Dr. Khungar's medical license for her violations of the Medical Practice Act.

¶ 26    The purpose of the Medical Practice Act is to protect the public health and welfare from those not qualified to practice medicine. *Nwaokocha v. Illinois Department of Financial and Professional Regulation*, 2018 IL App (1st) 162614, ¶ 63. To that end, the Department is the agency tasked with regulating and controlling Illinois' medical practice. *Id*.; 225 ILCS 60/22 (West 2018); 20 ILCS 2105/2105-10 (West 2018). Medical practitioners must hold an active license, show good "moral character," and be "physically, mentally, and professionally capable of practicing medicine with reasonable judgment, skill, and safety." 225 ILCS 60/3, 9 (West 2018). Failure to do so subjects a medical practitioner to disciplinary action by the Department, including license suspension. 225 ILCS 60/22 (West 2018).

¶ 27    Final administrative decisions issued by the Department under the Medical Practice Act are subject to judicial review pursuant to the Administrative Review Law. 225 ILCS 60/41(a) (West 2018); 735 ILCS 5/3-101 *et seq*. (West 2018). In reviewing a final administrative decision, we review the Director's decision and not the ALJ's or the circuit court's determination. *Parikh v. Division of Professional Regulation of the Department of Financial & Professional Regulation*, 2014 IL App (1st) 123319, ¶ 19. The standard of review depends on the question presented; this court reviews factual questions under the manifest weight of the evidence

standard, questions of law *de novo*, and mixed questions of law and fact under the clearly erroneous standard. *Danigeles v. Illinois Dept. of Financial and Professional Regulation*, 2015 IL App (1st) 142622, ¶ 69.

¶ 28    To elaborate, an administrative agency's factual findings, which are deemed *prima facie* true and correct, are against the manifest weight of the evidence only if the opposite conclusion is clearly evident. 735 ILCS 5/3-110 (West 2018); *Danigeles*, 2015 IL App (1st) 142622, ¶ 77. On the other hand, mixed questions of fact and law arise when the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, *i.e.* whether the rule of law applied to the facts is violated. *Parikh*, 2014 IL App (1st) 123319, ¶ 19. The Director's decision is clearly erroneous only where, after reviewing the entire record, we have a definite and firm conviction that a mistake has been committed. *Danigeles*, 2015 IL App (1st) 142622, ¶ 73. The clearly erroneous standard therefore is significantly deferential. *Wolin v. Department of Financial and Professional Regulation*, 2012 IL App (1st) 112113, ¶ 20.

¶ 29    *The Department Proved Counts 1-4 and Count 6 by Clear and Convincing Evidence*

¶ 30    Where, as here, the Department files a disciplinary complaint against the licensee, the Department maintains the burden of proving the allegations by clear and convincing evidence. 68 Ill. Admin. Code Section 1110.190(a) (eff. Sept. 13, 2019). Dr. Khungar first argues that the Department failed to meet its burden as to counts 1-4 and count 6.[2]

¶ 31    Here, the Department presented evidence as to Dr. Khungar's harassing conduct towards Bedi and the sheriff deputies (count 1), her personality disorder (count 2), her terminations from

---

[2]Dr. Khungar also maintains that the Department failed to prove count 7 by clear and convincing evidence, yet the Director already held that the Department failed to meet its burden as to that count. Accordingly, we need not consider Dr. Khungar's argument in that regard.

Access and Aunt Martha's (counts 3 and 6, respectively), and her misrepresentation on the 2016 credentialing form inquiring about pending disciplinary actions (count 4). The Director found that Dr. Khungar violated the Medical Practice Act by "[e]ngaging in dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public," with respect to counts 1, 3, and 6. See 225 ILCS 60/22(A)(5) (West 2018). The Director also found that Dr. Khungar's mental illness or disability (count 2) made it impossible for her to practice medicine with reasonable judgment, skill, and safety (see 225 ILCS 60/22(A)(27) (West 2018)), and further, that she made false, fraudulent, or deceptive statements on the 2016 credentialing form connected to her medical practice (count 4) (see 225 ILCS 60/22(A)(31) (West 2018)). We cannot say the Director's decision was against the manifest weight of the evidence or clearly erroneous.

¶ 32    The hearing evidence that Dr. Khungar engaged in unprofessional conduct of harm to the public was legion. The Department presented clear and convincing evidence that Dr. Khungar sent over 300 unwanted communications to Bedi, stalked him, and contacted his workplace and alma mater, and did so even after he had obtained a protective order against her prohibiting any such contact. Her communications to Bedi were indeed unprofessional and revealed a lack of respect for her own medical practice. Likewise, when appearing in court on the alleged protective order violations, Dr. Khungar engaged in yet more stalking behavior by reportedly taking Bedi's photograph, and when asked to give up her phone, she declined, instead choosing to get into a physical altercation with the deputy sheriffs. This prompted her brief incarceration, where she hurled epithets at the deputies, wished cancer on their children, and stated she would decline their treatment. This resulted in battery and resisting arrest charges being filed, only to be dropped once Dr. Khungar apologized.

¶ 33 Dr. Khungar's unprofessional antics infused her work at both Aunt Martha's[3] and Access, where she inspired both fellow physicians and patients to complain. The evidence showed she made inappropriate remarks and threats, interfered with patient care, violated medical privacy laws, and engaged in similar cyber-stalking behavior as she had with Bedi. In addition, she failed to reveal the then instituted and pending disciplinary complaint (filed in February 2016) on her 2016 credential form despite a direct question on the matter. The Director rejected Dr. Khungar's testimony that her attorney failed to inform her of the Department's complaint against her, where Dr. Khungar admitted to having attended, along with her attorney, an informal conference with the Department before filling out the form at issue. Dr. Dinwiddie testified that Dr. Khungar had a personality disorder that made her prone to workplace conflict and adversely affected her ability to treat patients, and the evidence supported that assessment. He elaborated that while Dr. Khungar might have the knowledge and skills necessary for a physician, her disruptive behavior impaired her judgment to a degree that made her unable to practice medicine safely. *Cf. In re Commitment of Montanez*, 2020 IL App (1st) 182239, ¶¶ 74-76 (finding the expert connected "the dots between respondent's risk of reoffending [as a sex offender] and his mental disorder."). Similarly, the Department's chief medical coordinator opined that Dr. Khungar's disruptive conduct had breached the standard of conduct of the profession. These facts showed Dr. Khungar violated the Medical Practice Act as set forth.

¶ 34 Dr. Khungar nonetheless attacks the Director's decision for a number of reasons. For example, in challenging count 1, Dr. Khungar essentially observes that Bedi's protective order against her no longer exists. She similarly maintains the Director incorrectly found she had

---

[3]We note that Dr. Khungar's argument as to Aunt Martha's consists of only several sentences with no record citations. The failure to comply with Rule 341(h)(7) and develop an argument results in forfeiture of the matter. See *Atlas*, 2019 IL App (1st) 180939, ¶ 33. Notwithstanding her forfeiture, we have included Aunt Martha's in the analysis above.

"multiple" violations of the protective order. Aside from her failure to provide any record citations to support her arguments, thus forfeiting them (see Ill. S. Ct. R. 341(h)(7) eff. May 25, 2018)), she appears to discount the Director's finding that Bedi was forced to obtain the protective order (lasting 2014-2017) based on her harassing behaviors towards him and that Dr. Khungar was aware that later contacting Bedi's employer by phone and email would violate the protective order. The record also contains the dean's affidavit describing the contact following the protective order's entry and Dr. Khungar admitted as much in her testimony. Thus, the ALJ and the Director's findings were amply supported by the evidence.

¶ 35    As to count 3, for example, Dr. Khungar maintains that no witness testified about her threat to burn down the building at Access even though her own witness did, as did the human resources vice president. Dr. Khungar argues Access, instead, terminated her based on her Indian race and in retaliation for her having filed a complaint with the Equal Employment Opportunity Commission (EEOC) shortly before her termination. However, Dr. Jairo Mejia, who made the decision to terminate Dr. Khungar, testified to the contrary that he did not learn of her claims of discrimination until after Dr. Khungar was terminated. ALJ Gruber found Dr. Mejia credible and also found "the most reasonable inference" drawn from her statements about fire was that she intended to "light the place on fire." Again, the ALJ and Director's findings were amply supported by the evidence.

¶ 36    All this reveals that while Dr. Khungar urges us to find her testimony and that of her witnesses and medical expert more credible, we must decline such an invitation for several key reasons. First, Dr. Khungar's witnesses did not necessarily contradict the Department's case in chief given that many of them were unaware of the incidents detailed by the Department's witnesses. ALJ Gruber expressly found Dr. Khungar was incredible, and the Director adopted

that finding. Dr. Khungar was not just disruptive in her workplace but also in the present proceedings. Second, it's for the Director, as the trier of fact, to evaluate the evidence, judge the credibility of witnesses, resolve any conflicts in the evidence, and draw reasonable inferences and conclusions from the facts. *Nwaokocha*, 2018 IL App (1st) 162614, ¶ 52. It's not this court's role to reevaluate witness credibility or resolve conflicting evidence, as Dr. Khungar requests us to do; rather, we determine only if factual findings are supported by the manifest weight. *Id.*; see also *Parikh*, 2014 IL App (1st) 123319, ¶ 29 (noting that the court's "sole inquiry is whether anything in the record supports the Director's decision[.]"). Here, the opposite conclusion is not clearly evident, nor are we left with a definite and firm conviction that a mistake was committed where the facts satisfied the statutory standard. See *Danigeles*, 2015 IL App (1st) 142622, ¶¶ 73, 77.

¶ 37     *The Director Correctly Denied Dr. Khungar's Motion to Dismiss the Original Complaint and Count 3 of the Second-Amended Complaint*

¶ 38     We thus reject Dr. Khungar's related argument that her "private, social relationship" with Bedi "has no bearing on the practice of medicine" and is outside the purview of the Medical Practice Act. Dr. Khungar effectively argues that the only kinds of offenses that can be found to be related to the purpose of the Medical Practice Act are those that are directly related to "improper medical care." For those reasons, Dr. Khungar maintains the Director via the ALJ erred in denying her motion to dismiss the original administrative complaint. Dr. Khungar, however, fails to cite any applicable legal standards in reviewing a motion to dismiss and fails to adequately develop her argument, thus forfeiting it. See *Atlas v. Mayer Hoffman McCann, P.C.*, 2019 IL App (1st) 180939, ¶ 33 (noting, an issue that is not clearly defined and sufficiently presented does not satisfy Rule 341(h)(7) and is thus forfeited). Forfeiture aside, we disagree, as

we review the matter *de novo*. See *Siddiqui v. Illinois Dept. of Professional Regulation*, 307 Ill. App. 3d 753, 759 (1999).

¶ 39     As stated, the purpose of the Medical Practice Act is to protect the public health and welfare from those not qualified to practice medicine. *Nwaokocha*, 2018 IL App (1st) 162614, ¶ 63. The administrative rules state:  activities that cause "actual harm to any member of the public" qualify as "dishonorable, unethical, or unprofessional conduct."[4] 68 Ill. Adm. Code 1285.240(a)(1)(E) (eff. July 6, 2018). Where, as here, Dr. Khungar stalked and harassed a member of the public for years, harming him both personally and professionally, and then discussed her ensuing personal and legal matters at work and with patients (making the private relationship otherwise quite public), we must defer to the Director's determination that Dr. Khungar engaged "in dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public" in violation of the Medical Practice Act.[5] See 225 ILCS 60/22(A)(5) (West 2018); *Nwaokocha*, 2018 IL App (1st) 162614, ¶ 63; see also *Danigeles*, 2015 IL App (1st) 142622, ¶¶ 104-05 (where a dentist was found to have fraudulently billed two insurance companies and made false statements on insurance claim forms, her "repeated and brazen conduct put the public's welfare in jeopardy" and the Department's decision to revoke her dental license for a minimum of five years and impose a $125,000 fine was not unrelated to the purpose of the Illinois Dental Practice Act (225 ILCS 25/1 *et seq*. (West 2012))). Reading the statute more narrowly, as Dr. Khungar wishes, would be contrary to the dictates of statutory

---

[4]The administrative rules list a number of questionable activities, like being convicted of a crime of larceny, putting an incompetent person in charge of a patient, misrepresenting one's educational background, etc. Under the administrative rules, this list is not exhaustive contrary to Dr. Khungar's suggestion otherwise. 68 Ill. Adm. Code 1285.240(a)(2) (eff. July 6, 2018).

[5]Dr. Khungar also makes an argument as to "immoral conduct," section 22(A)(2) under the Medical Practice Act (see 225 ILCS 60/22(A)(20) (West 2018)), but there was never any finding as to that section.

interpretation, which require that we view language in its plain and ordinary meaning to divine legislative intent. See *Gillespie Community Unit School Dist. No. 7, Macoupin County v. Wight & Co.*, 2014 IL 115330, ¶ 31.

¶ 40 We find Dr. Khungar's reliance on *Miller v. Department of Registration & Education*, 75 Ill. 2d 76, 25 (1979), misplaced. There, the supreme court held that a misdemeanor conviction for the payment of kickbacks or bribes did not constitute "gross immorality" concerned with the practice of pharmacy under the Pharmacy Practice Act and thus reversed the revocation of three pharmacists' licenses on that basis. The supreme court held the practice of pharmacy under the statute did not encompass business aspects. *Miller*, however, dealt with a different standard (gross immorality), a different statute (the Pharmacy Practice Act), and as the dissent in *Miller* noted, that statute has since been amended. *Miller* is thus antiquated and inapplicable.

¶ 41 We similarly reject Dr. Khungar's argument that section 22(A)(5) of the Medical Practice Act is overly broad. 225 ILCS 60/22(A)(5) (West 2018). As set forth in *Pundy v. Department of Professional Regulation*, 211 Ill. App. 3d 475, 485 (1991), the term "unprofessional conduct" is commonly understood by the medical profession, and when combined with the legislative purpose of protecting the public against unfit doctors, the term provides fair notice to professionals without being constitutionally vague. The court continued, "a statute such as this must be broad because it would be impossible for a statute to catalog specifically every act of unprofessional or dishonorable conduct which would justify the revocation of a license." *Id*. at 485-86. Therefore, while the Medical Practice Act does not specifically identify stalking and harassing a private citizen as prohibited conduct, the common understanding of "unprofessional conduct," should have placed Dr. Khungar on notice that her behavior was subject to disciplinary action. Moreover, it should be noted that when a broad statutory standard has been delegated to

an agency's discretion, the reviewing court should rely on the agency's interpretation as controlling. *Id.*

¶ 42    Dr. Khungar also argues the Director erred in denying her motion to dismiss count 3 of the second-amended complaint relating to her alleged threat to burn the building at Access. Dr. Khungar notes a hearing officer in a separate unemployment proceeding found she did not make the threat, finding it significant that "[t]he employer witness who testified at the hearing did so from hearsay." Dr. Khungar, again fails to cite applicable legal standards in reviewing her motion to dismiss, thus forfeiting the matter. See *Atlas*, 2019 IL App (1st) 180939, ¶ 33. Forfeiture aside, her argument fails since factual findings in unemployment proceedings are not binding and cannot be used as evidence in other contexts. See 820 ILCS 405/1900 (West 2018). This is because those proceedings are brief and informal in nature, and on appeal, Dr. Khungar has not adequately identified the nature of the evidence relied on in her unemployment proceeding, the "employer witness" who testified, or the burden of proof required therein. See *Grafner v. Department of Employment Security*, 393 Ill. App. 3d 791, 802 (2009). Notably, in contrast to the unemployment proceedings, the ALJ in this case relied on non-hearsay testimony as to Dr. Khungar's threats. See *infra*, ¶ 60. Aside from those facts, there were plenty of other allegations in count 3, which if supported, would form a sufficient basis for discipline. See 68 Ill. Admin. Code 1110.210(a)(1) (eff. Sept. 13, 2019). The allegations as to Access included Dr. Khungar's unauthorized use of patient records, the numerous complaints from patients and staff, and inappropriate comments. The Director via the ALJ thus did not err in denying her motions to dismiss.

¶ 43          *The Director Did Not Violate Dr. Khungar's Due Process Rights*

¶ 44    Dr. Khungar next raises various claims that the Director violated her due process rights, each of which we address in turn under our *de novo* review. See *Wolin*, 2012 IL App (1st) 112113, ¶ 25. While an administrative proceeding is governed by the fundamental principles and requirements of due process of law, it's been held that due process is a flexible concept and requires only such procedural protections as fundamental principles of justice and the particular situation demand. *Abrahamson v. Illinois Dept. of Professional Regulation*, 153 Ill. 2d 76, 92 (1992). An administrative hearing comports with due process where the parties are given the opportunity to be heard, the right to cross-examine adverse witnesses, and impartiality in ruling upon evidence. *Wolin*, 2012 IL App (1st) 112113, ¶ 25. A court will find a due process violation only if there is a showing of prejudice. *Id*.

¶ 45              *A. Two Different ALJs Properly Presided at the Hearing*

¶ 46    Dr. Khungar first contends her due process rights were violated because two different ALJs oversaw the administrative hearing. Here, ALJ Lyons presided over the first three days of trial. Dr. Khungar was the only witness to testify before ALJ Lyons. ALJ Lyons then retired and was replaced by ALJ Gruber, who oversaw the remaining 18 days of trial, hearing Dr. Khungar for several days and some 40 other witnesses. When issuing his 102-page report, ALJ Gruber considered Dr. Khungar's adverse testimony before ALJ Lyons. Dr. Khungar, however, maintains her due process rights were violated where ALJ Gruber made credibility determinations without presiding over the entire trial. We reject her contention for several reasons.

¶ 47    First, counsel for Dr. Khungar not only failed to object to ALJ Gruber's substitution, but welcomed his "participation in this matter." While noting there was no "notice" of the switch, counsel did not object to it. This was no surprise given that shortly after the hearing began and

after two days of Dr. Khungar's adverse testimony, Dr. Khungar had sought to substitute ALJ Lyons due to scheduling concerns (but was unsuccessful). Dr. Khungar likewise did not raise specific objections about the two presiding administrative judges in her motion to reconsider the ALJ and Board's decisions. While Dr. Khungar complained that ALJ Gruber did not observe her first several days of testimony, she noted this in the context of arguing the hearing was not conducted in a timely manner. Thus, not only did Dr. Khungar forfeit her due process argument by failing to object, she acquiesced to any claimed error. See *Gaffney v. Board of Trustees of Orland Fire Protection Dist.*, 2012 IL 110012, ¶ 33 (noting that invited error prohibits a party from requesting to proceed in one manner and then contending on appeal that the requested action was error); *Cinkus v. Village of Stickney Municipal Officers Electoral Bd.*, 228 Ill. 2d 200, 212-13 (2008) (noting that an argument or issue not presented in an administrative hearing is defaulted).

¶ 48    Second, even this procedural default aside, Dr. Khungar's claim fails on the merits. "[I]n the absence of statutory provisions to the contrary, it is not necessary that testimony in [an] administrative proceeding be taken before the same officers who have the ultimate decision-making authority." *Homefinders, Inc. v. City of Evanston*, 65 Ill. 2d 115, 128 (1976); see also *Forest Preserve Dist. of Cook County v. Illinois Labor Relations Bd.*, 369 Ill. App. 3d 733, 748-49 (2006) (same).  Rather, "[t]he requirements of due process are met if the decision-making board considers the evidence contained in the report of proceedings before the hearing officer and bases its determinations thereon." *Id*. Here, there was no statutory requirement that the Director, the final decision-maker, personally hear the parties' evidence and testimony. *Cf. Quincy Country Club v. Human Rights Comm'n*, 147 Ill. App. 3d 497, 499-500 (1986) (finding the Illinois Human Rights Act at issue contemplated that a single hearing officer should preside

over the hearing and end decision). Instead, under the rules, the ALJ conducts the hearing and the Director then issues a final decision after reviewing the record and both the ALJ and Board's reports. 68 Ill. Admin. Code 1110.240 (eff. Sept. 13, 2019). This is just what occurred here. ALJ Gruber issued his report detailing the hearing evidence, the Board adopted the report, and the Director then issued its final decision based on the reports and record.

¶ 49     Due process requirements were also met where ALJ Gruber presided over the bulk of the hearing (18 out of 21 days), his final decision considered Dr. Khungar's testimony before ALJ Lyons, and notably, ALJ Gruber was able to assess Dr. Khungar's testimony over the course of several days in addition to her conduct while representing herself *pro se*. See *North Shore Sanitary District v. Illinois State Labor Relations Board*, 262 Ill. App. 3d 279, 295 (1994); *cf. Quincy Country Club*, 147 Ill. App. 3d at 499 (finding a due process violation where one ALJ presided over the entire evidentiary hearing and a different ALJ prepared the recommended order). Accordingly, Dr. Khungar's due process challenge fails.

¶ 50             *B. The Department Provided Notice of Charges Against Dr. Khungar*

¶ 51     Dr. Khungar asserts the Department failed to provide her with fair notice of the charge against her concerning employment with Aunt Martha's, which was added to the third-amended complaint, and also the charge against her concerning Bedi.

¶ 52     Dr. Khungar provides no record citations for either argument. Her argument as to Aunt Martha's consists of only several sentences. Rule 341(h)(7) requires that an argument "contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." *Id*. As a reviewing court, we are entitled to have the issues clearly defined, supported by pertinent authority, and cohesive arguments. *Atlas*, 2019 IL App (1st)

180939, ¶ 33. As such, this court is not a mere repository into which an appellant may dump the burden of argument and research. *Id.* Dr. Khungar therefore has forfeited her arguments.

¶ 53    Forfeiture aside, her arguments fail on the merits. Here, Dr. Khungar was reasonably apprised of the charge (count 6) against her, as the complaint notified Dr. Khungar of her relevant violative conduct at Aunt Martha's, where the conduct occurred, and the statute the conduct allegedly violated. See *Abrahamson*, 153 Ill. 2d at 93 (noting that a charge in an administrative proceeding need not be so precise as in a judicial proceeding, but only reasonably advise a person so she can intelligently prepare a defense). That the complaint was amended after three days of trial testimony is of no moment given that the hearing was lengthy and Dr. Khungar had not yet begun to present her case. Moreover, she was well aware that workplace conduct and terminations were at issue because of the prior amended complaints and the previously-issued subpoena to Aunt Martha's (issued in January 2017). See *Morgan v. Department of Financial & Professional Regulation*, 388 Ill. App. 3d 633, 666 (2009) (noting that a court may consider discovery and other materials available to the plaintiff in determining adequate notice of charges).

¶ 54    While Dr. Khungar maintains she had no fair warning or notice that her "personal relationship" with Bedi could result in disciplinary action under section 22(A)(5) of the Medical Practice Act, we have already rejected this argument. See *supra*, ¶ 41. Likewise, her contention that the testimony of the Department's chief medical coordinator was unconstitutional for vagueness is unclear and lacks both legal support and record citations. We will not consider it further.

¶ 55    *C. Dr. Khungar's Claim About the Temporary Suspension of Her License is Moot*

¶ 56    Dr. Khungar contends that her due process rights were violated when, starting in late January 2017, the Director temporarily suspended her license on the Department's motion prior to the full administrative hearing (which began in May 2017). The Department sought suspension believing Dr. Khungar to be an immediate danger to the public, and she now disputes the evidence underlying that characterization. In July 2017, the circuit court, however, ordered the Director to reinstate Dr. Khungar's license, finding a hearing on the temporary suspension was not timely held. Thereafter, the Department filed its third-amended complaint, and the full administrative hearing as set forth continued to proceed (concluding in November 2017).

¶ 57    The Department maintains, and we agree, that Dr. Khungar's due process argument is moot. A matter on appeal is moot if no actual controversy exists or if events have occurred that make it impossible to grant the complaining party effectual relief. See *Fisch v. Loews Cineplex Theatres, Inc.*, 365 Ill. App. 3d 537, 539 (2005). Dr. Khungar obtained what she originally sought, the reinstatement of her license. Dr. Khungar's opening brief has not identified any effectual relief that we can grant her from the temporary suspension. In addition, her license is now indefinitely suspended following a full and fair hearing, further making moot any concerns about the temporary suspension. In her reply brief, Dr. Khungar requests damages, including lost income and reputation harm, from the six-month temporary suspension. However, "[p]oints not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). Moreover, she forfeited her argument for damages by failing to raise it in her complaint for administrative review before the circuit court, and it therefore cannot be raised on appeal. See *Messer & Stilp, Ltd. v. Department of Employment Security*, 392 Ill. App. 3d 849, 861 (2009).

¶ 58                    *The Director Did Not Rely on Inadmissible Evidence*

¶ 59    Dr. Khungar next argues that the Director, in finding against her on counts 1 and 2, improperly relied on expunged criminal records related to her arrest for battery of the sheriff's deputy and resisting arrest. Dr. Khungar, however, has failed to provide any record citation showing the Director did so. See Ill. S. Ct. Rule 341(h)(7) (eff. May 25, 2018); *Atlas*, 2019 IL App (1st) 180939, ¶ 33. Dr. Khungar also has not demonstrated it was improper for the Director to rely on evidence of her poor conduct and insults *surrounding* the arrest, where the deputy sheriffs directly testified to these facts. See *Sroga v. Personnel Board of City of Chicago*, 359 Ill. App. 3d 107, 113 (2005) (noting that expungement does not eliminate the facts and circumstances leading to the arrest, nor does it prohibit consideration of them by an administrative agency). Indeed, the Director (via the ALJ) also specifically noted the Department's chief medical coordinator found the threats of wishing cancer on children so as to decline medical treatment and Dr. Khungar's inability to comply with courthouse rules violated the very core of medical professionalism. The Director's focus was on her unprofessional conduct rather than the actual fact of the arrest. Regardless, there was plenty of other evidence to support counts 1 and 2, so there was no prejudice. See *Matos v. Cook County Sheriff's Merit Bd.*, 401 Ill. App. 3d 536, 541 (2010) (noting that the admission of evidence before an administrative agency warrants reversal only where there is prejudice to the complaining party).

¶ 60    Dr. Khungar also claims the Director improperly relied on hearsay documents and testimony. She provides a string cite of 26 documents purportedly containing hearsay without any further explanation. This is demonstrably insufficient to satisfy Rule 341(h)(7) and the requirements that the appellant adequately develop an argument. See *Vancura v. Katris*, 238 Ill. 2d 352, 370 (2010) (noting that an issue that is merely listed or included in a vague allegation of error is not "argued" and will not satisfy the requirements of Rule 341(h)(7)). Her argument as to

testimony meets a similar fate, as she has not adequately identified or expounded on the specific statements she's challenging. See *id*. She appears to argue the Director improperly relied on hearsay statements as to her fire threats at Access, but the ALJ explicitly relied on the testimony of Access' human resources director that Dr. Khungar acknowledged making the insinuated threat. The ALJ also relied on Dr. Khungar's own witness Zuniga who testified that Dr. Khungar said something to the effect that she would " ' Light fire to this place,' " and at one point, Zuniga saw Dr. Khungar with a just-lit match. This was not hearsay. See *Vojas v. K mart Corp.*, 312 Ill. App. 3d 544, 547 (2000) ("Any statement made by a party or on his behalf that is relevant to a trial issue may generally be admitted into evidence as an admission by a party opponent.").

¶ 61      *The Director's Suspension of Dr. Khungar's Medical License Was Not an*

*Abuse of Discretion*

¶ 62      Dr. Khungar finally challenges the indefinite suspension of her medical license for a minimum of 18 months. Where, as here, we are reviewing the propriety of a particular sanction imposed by the Director, the standard of review is whether the Director abused its discretion in imposing the sanction. *Nwaokocha*, 2018 IL App (1st) 162614, ¶ 53. The Director abuses its discretion where the sanction is overly harsh, arbitrary or unreasonable under the mitigating circumstances, or it's unrelated to the statute's purpose, and no reasonable person could agree with the decision. *Id*.; *Lake Environmental, Inc. v. Arnold*, 2015 IL 118110, ¶ 16. We defer to the administrative agency's expertise and experience in determining what sanction is appropriate to protect the public interest. *Abrahamson*, 153 Ill. 2d at 99.

¶ 63      Dr. Khungar maintains the Director's decision was overly harsh given her previously unblemished record and the numerous witnesses who testified on her behalf vouching for her professionalism as a doctor. She also argues it was inconsistent with the Act. We disagree. Here,

the evidence showed very unprofessional conduct in work and public settings, apparently as a result of Dr. Khungar's mental illness. It also showed Dr. Khungar lacked insight, understanding, and contrition for her various offenses and behaviors. The Director did not revoke her license but only suspended it for the seeming purpose of allowing Dr. Khungar to right herself. From the record, briefs, and oral arguments, however, there is no evidence that Dr. Khungar has completed the mental health treatment recommended by Dr. Dinwiddie even though her minimum 18-month suspension has already passed. The Director's sanction was in step with the purpose of the Medical Practice Act, which is to protect the public from unfit physicians. And, while we may consider the severity of the sanction imposed, it is not our job to reassess the mitigating circumstances in the stead of the agency with expertise in this area. See *Abrahamson*, 153 Ill. 2d at 99; *Sutton v. Civil Service Commission*, 91 Ill. 2d 404, 411 (1982). In other words, we cannot say no reasonable person could agree with the decision. See *Sonntag v. Stewart*, 2015 IL App (2d) 140445, ¶ 22. The Director's decision was supported by the evidence and thus appropriate.

¶ 64                                        CONCLUSION

¶ 65     Based on the foregoing, we affirm the judgment of the circuit court affirming the Director's decision to indefinitely suspend Dr. Khungar's medical license for a minimum of 18 months.

¶ 66     Affirmed.